GEORGE H. ALLAN, Appellant, v. HARGADINE-MCKITTRICK DRY GOODS COMPANY.

Division Two, June 28, 1926.

**1. DEMURRER TO EVIDENCE: Admissions.** In determining whether defendant's demurrer to the evidence offered at the close of plaintiff's case should be sustained, all matters well pleaded in the petition and shown by the evidence are taken as true, and the plaintiff is entitled to every reasonable inference which a fair-minded jury of average intelligence might draw from the proven facts.

**2. ————: Joint Adventure: Express Contract: Share in Profits: Quantum Meruit.** Plaintiff was a stockholder of defendant dry goods company, and in charge of one of its departments at an annual salary; defendant was about to enter into a contract with a hardware company for the manufacture of 800,000 knapsacks, and orally agreed with plaintiff that if he would become a joint adventurer with defendant in the work of manufacturing said knapsacks and carrying out its contract with the hardware company, and would superintend and direct the work, he would receive a good part or share of any profits accruing from the fulfillment of said contract, but should receive nothing if no profits were made. Plaintiff fully performed his part of the agreement, and the hardware company paid defendant for the knapsacks, and the net profits were $60,000, and plaintiff sues for $30,000 and interest. *Held,* that said facts being alleged and proved, it was error to sustain a demurrer to the evidence; but as there was no provision for sharing the losses and no definite provision relating to a division of the profits, but the petition alleges and the proof shows a contract of employment without any definite agreement as to compensation, plaintiff is entitled to recover only in **quantum meruit** the value of his services rendered, and the petition should be accordingly framed.

**3. ————: ————: Employee.** An employee of a dry goods company at a stated salary, while in charge of a sales department, has a legal right, in addition to his regular employment, to make a valid contract with the company to superintend and control, in its factory, the manufacture of articles, which the company has agreed to furnish another company, for a portion of the profits realized from a fulfillment of such agreement; and

if he fully performs his part of the contract he is entitled, in addition to his salary, to share in the profits arising from the venture.

Corpus Juris-Cyc. References: **Appeal and Error,** 4 C. J., Section 2708, p. 764, n. 76, 80. **Corporations,** 14 C. J., Section 1329, p. 868, n. 93. **Joint Adventures,** 33 C. J., Section 97, p. 871, n. 23, 26.

Appeal from Circuit Court of City of St. Louis.—Hon. Thomas Bond, Judge.

REVERSED AND REMANDED.

*Anderson, Gilbert & Wolfort* and *Abbott, Fauntleroy, Cullen & Edwards* for appellant.

(1)    The evidence tended to prove a joint adventure and the court erred in not submitting that issue to the jury. Wetmore v. Crouch, 150 Mo. 680; Dierks Lumber Co. v. Bruce, 239 S. W. 132; Lind v. Webster, Ann. Case 1916 (Mo.) 1202; Hoge v. George, 200 Pac. 99; Flower v. Barnekoff, 20 Ore. 132, 11 L. R. A. 149; Kayser v. Maugham, 8 Colo. 232; Smith v. Imhoff, 89 Wash. 418; Butler v. Union Trust Co., 172 Pac. (Cal.) 601; Jones v. Patrick, 140 Fed. 409; Irvine v. Campbell, Ann. Cas. 1914-C (Minn.) 689. (2) Where the existence of the relationship is in issue, and there is substantial evidence tending to prove that the parties intended to join their efforts in furtherance of the enterprise for their joint profit, the question is, of course, one for the jury. Hoylon v. Appleton Mach. Co., 192 N. W. 168; Pyron v. Brownfield, 238 S. W. 724; Van Tine v. Hilands, 131 Fed. 124; Hoge v. George, 200 Pac. (Wyo.) 99; 33 C. J. 845, 861. (3) In the absence of an express agreement between the parties to a joint adventure as to the proportions in which they are to share in the profits thereof, the law presumes that they intended that each should share equally with the others, notwithstanding an inequality in the amounts contributed by them to the capital employed in the venture or in the amount of services performed by them respectively. Wetmore v. Crouch, 150 Mo. 671; Knapp v. Hanley, 108 Mo. App. 353; Douglass v. Merceles, 23 N. J. Eq. 331; Anderson v. Blair, 206 Ala. 418; Van Tine v. Hilands, 131 Fed. 124; Goss v. Lanin, 170 Iowa, 57; Warner v. Wood, 200 Fed. 542; Lind v. Webber, 36 Nev. 623, 50 L. R. A. (N. S.) 1046, Ann. Cas. 1916A, 1202; Gamble v. Loffler, 28 S. D. 239; Hoge v. George, 27 Wyo. 423; Senneff v. Healy, 155 Iowa, 82, 39 L. R. A. (N. S.) 219. (4) When a transaction under a joint adventure has been closed and the profits are ascertainable by a simple computation, the law implies a promise by the member having possession of the fund to

pay to his associates the share thereof to which each is entitled, and this promise is enforceable at law in an action of assumpsit. See-horn v. Hall, 130 Mo. 257; Reid v. Shaffer, 249 Fed. 553; Wann v. Kelley, 5 Fed. 584; Hurley v. Walton, 63 Ill. 260; Thomas v. Stenhouse, 210 Ill. App. 372; Daniel v. Daniel, 166 Ky. 182; Sporie v. Fitts, 119 Me. 362; Felbel v. Kahn, 29 App. Div. 270, 51 N. Y. Supp. 435; Jones v. McNally, 53 Misc. 59, 103 N. Y. Supp. 1011; Ledford v. Emerson, 140 N. C. 288, 4 L. R. A. (N. S.) 130, 6 Ann. Cas. 107; Finlay v. Stewart, 56 Pa. 183; Wright v. Crumpsty, 41 Pa. 102; Gillis v. McKinney, 6 Watts & S. 78; Cleveland v. Farrar, 4 Brewst. 27; Peterson v. Nichols, 90 Wash. 398; Annon v. Brown, 65 W. Va. 34. (5) Where an express contract has been fully performed on plaintiff's part, and nothing remains to be done under it but the payment of money by defendant, which is nothing more than the law would imply against him, plaintiff may declare generally in *indebitatus assumpsit.* Moore v. H. Gaus Mfg. Co., 113 Mo. 98; Williams v. Railroad Co., 112 Mo. 463, 34 Am. St. 403; Mansur v. Botts, 80 Mo. 651; Stout v. St. Louis Tribune Co., 52 Mo. 342; Ingram v. Ashmore, 12 Mo. 574; Kennerly v. Somerville, 68 Mo. App. 222; American Surety Co. v. Constr. Co., 182 Mo. App. 667; Wilson v. Wilson, 106 Mo. App. 501; 5 C. J. sec. 17, p. 1386.

*Nagel & Kirby* and *Charles P. Williams* for respondent.

(1) There was no joint adventure shown by the evidence. The analogies of parternership require a principalship—a community of ownership—in the profits as such. A proportion of the profits, by way of compensation for extra work, is not enough. Denny v. Cabot, 6 Metc. 82; Ross v. Burrage, 233 Mass. 439; Hill v. Curtis, 139 N. Y. Supp. 428; Baum v. Stephenson, 133 Mo. App. 187; Wiggins v. Graham, 51 Mo. 20; Campbell v. Dent, 54 Mo. 325; Ashby v. Shaw, 82 Mo. 76; Hughes v. Ewing, 162 Mo. 261; Daniel v. Stone, 30 Me. 384; Ball v. Schuberth, 2 Md. 38; Burton v. Goodspeed, 69 Ill. 237; Hely v. Hinerman, 303 Mo. 147; Skinner v. Whitlow, 184 Mo. App. 229; Sain v. Rooney, 125 Mo. App. 187; Bank of Odessa v. Jennings, 18 Mo. App. 651; Beckwith v. Talbot, 2 Colo. 639; Shepard v. Pratt, 16 Kan. 209; Berthold v. Goldsmith, 24 How. (U. S.) 536; Macy v. Combs, 15 Ind. 469; Emmons v. Finck, 21 Hun, 210; Stone v. Turfmen's Association, 103 Ky. 318; Cline v. Caldwell, 4 La. 137; Prouty v. Swift, 51 N. Y. 594; Kellogg v. Griswold, 12 Vt. 291; Martin v. Riehl, 58 N. Y. Supp. 141; Burns v. Niagara Co., 130 N. Y. Supp. 54. (2) The "good share of the profits" that Mr. McKittrick promised plaintiff Mr. McKittrick was to get the company to give to plaintiff. It nowhere appears that plaintiff was to be liable as a principal or to be held for losses. National Bank v. Francis,

296 Mo. 169, 192.   The burden to show the relationship claimed rests strongly on plaintiff.   Chapin v. Cherry, 243 Mo. 408.   (3) Plaintiff having pleaded solely an express contract of joint adventure cannot recover on a *quantum meruit* for services rendered. Arnold v. Angell, 62 N. Y. 508; Smith v. Dunn, 44 N. Y. Misc. 288.

RAILEY, C.—On January 20, 1916, the plaintiff, George H. Allan, filed his petition in the Circuit Court of the City of St. Louis, Missouri, against the Hargadine-McKittrick Dry Goods Company, a corporation.   Omitting caption and signature, said petition reads as follows:

"Plaintiff states that defendant is, and was at all times herein mentioned, a corporation duly organized.

"Plaintiff further states that on or about the 1st day of October, 1914, George W. Simmons desired to have manufactured for him knapsacks and bags, and agreed with defendant that if defendant would undertake to organize a factory force and manufacture said knapsacks and bags in its factory he (the said George W. Simmons) would furnish all machines and factory equipment necessary for the manufacture of said bags and knapsacks which was not then in said factory, and would furnish all materials entering into the manufacture of said knapsacks and bags, and would furnish all money necessary to finance the operation of said factory; provided, however, said dry goods company would agree to run said factory night and day as far as possible, to manufacture and deliver said knapsacks and bags.

"That defendant then and there agreed with plaintiff that if he would become a joint adventurer with defendant in the work of manufacturing said articles and carrying out its said contract with said Simmons, and if the plaintiff would undertake to form a factory force and organization for the purpose of manufacturing said knapsacks and bags and would superintend and direct said organization and would work night and day, as far as possible, in the manufacture of said knapsacks and bags, in event he could make a profit from the manufacture of said bags and knapsacks plaintiff should be entitled to and would receive a good part or share of any profits accruing from the execution and fulfillment of said contract, but plaintiff should receive nothing if no profits were made.

"The defendant and plaintiff were the only persons interested in said adventure, and it was understood and agreed that the profits and losses, if any, of the venture should be shared equally between them.

"That then and there plaintiff agreed to work with defendant and form a factory force and organization and superintend and direct the same in the manufacture of said bags and knapsacks upon the terms and conditions above set out.

315 Mo.—17.

"That thereupon said dry goods company entered into a contract with said George W. Simmons for the manufacture of said knapsacks and bags upon the terms and conditions above set out.

"That thereafter plaintiff did work with defendant and form a factory force and organization and did enter into the manufacture of said knapsacks and bags and did continue superintending and directing said force in the manufacture of the same until on or about October 5, 1915, and worked night and day as far as was possible in the manufacture of said knapsacks and bags; that all bags and knapsacks were manufactured and delivered by October 5, 1915.

"That said George W. Simmons complied with said agreement, put up with defendant sufficient money to finance said factory during the entire time said bags and knapsacks were being manufactured, and paid to defendant all sums due defendant; that from the manufacture of said knapsacks and bags a profit, which is now in the possession of defendant, of over $60,000 was made.

"That plaintiff is entitled to $30,000, the same being one-half of the said profits, and that said sum is due and owing from the defendant to plaintiff; that defendant refuses to pay said sum and every part thereof, to plaintiff's damage in the sum of $30,000.

"Wherefore, plaintiff prays judgment against defendant for $30,000, with six per cent interest and for his costs."

The defendant, in its answer to second amended petition, admits that it is a corporation, and denies every other allegation contained in said petition.

The case was reached for trial on June 10, 1918, before Judge Thomas Bond and a jury, the evidence of plaintiff was completed on the following day, and at the conclusion of same a demurrer to plaintiff's evidence was sustained and appellant took an involuntary nonsuit with leave, etc. On June 12, 1918, plaintiff filed his motion to set aside said nonsuit, which was overruled on July 1, 1918. Thereafter, during the same time, on application of plaintiff, an appeal was duly allowed him to this court. Thereafter, a bill of exceptions was filed in the trial court on March 20, 1926.

The only evidence offered in the case was that of plaintiff, George H. Allan, who testified as follows:

"My name is George H. Allan. For many years' prior to the fall of 1914 I had been with the Hargadine-McKittrick Dry Goods Company. In the fall of 1914 I was in the employ of the Hargadine-McKittrick Dry Goods Company. I was in charge of the ready-to-wear shirt-and-neckwear departments. I had no title, and I received a salary for the years 1914 and 1915 amounting to $4,500 or $5,000 per year. I was also a stockholder in Hargadine-McKittrick Dry Goods Company. At that time the company had a factory on the fifth floor of a building at Twenty-second and Washington Avenue

in St. Louis, Missouri, under lease, and for which it was paying rent. It had been shut down a year previously. I had made them up a great many samples, and finally designed a bag their customer would accept; they wanted me to give them a price on eight hundred thousand of them; we had a factory that was shut down that we had a lease on, that had not been operated for at least a year; that had never made us a dollar of profit since we had owned it, and I thought there was a chance of turning that factory—turning this business into that factory and making a very nice profit. He asked me how much. I told him I thought if I was let alone, I could make $50,000 out of it, but that not to figure it that much; that we would make $39,000 or $40,000, I was sure; it depended on how it was worked. He said, 'If you can turn the overall factory, which has. always been a loser, to a profit anything like that, it will be the biggest thing this company ever did, and 1 hope you will leave nothing undone to get that business.' I told him I would figure out the cost; asked him if he would like to check my figures. He said he would be very glad to. I went ahead; went down to Simmons Hardware Company and quoted them a price.

"He checked over the figures. The Simmons Hardware Company then notified me that their client had changed their specifications, and that the bags would have to be made larger and out of very much heavier material, which necessitated a whole new arrangement again. I went back and made up other samples and made up other figures. I told Mr. McKittrick that the matter was still hanging fire; that we hadn't been able to cinch the contract, but I was still working on it. I submitted another set of samples and another set of figures, and I did that probably twenty times, until we finally got the cost we were to get out of those bags up to four times the original price. When we were up to where we could get the matter closed, I went back and reported to him the progress I had made; told him there was just one thing that stood in the way, and told him that was getting out the quantity. Every time we talked it over, the Simmons people changed their idea of how many they had to have per day; they began to crowd me so bad, I began to get skeptical as to our ability to turn them out. Mr. McKittrick insisted on me doing everything I possibly could to get the contract. It finally came to the point where the Simmons people said they were ready to accept our proposition, provided we would agree to turn out six thousand a day. I told them the only way they could get us to do that, they would have to furnish the machines and guarantee them. They would have to deposit enough money ahead of all our expenses, so the Hargadine-McKittrick Dry Goods Company wouldn't have to put in a cent, and if they would do that, there is no doubt—and would

not crowd us too hard on deliveries—there was no doubt but what, a very handsome profit could be worked out of the thing.

"I would say these negotiations took six weeks; probably two months. My guess would be six weeks. While I was talking to Mr. McKittrick, the Simmons people came up there and said they would have to change the arrangements, and we would have to agree to get out eight thousand bags a day, and we would have to agree to work day and night and double shifts, Sundays and holidays; and I said, 'Gentlemen, I am through; I won't touch it.' The matter was for the moment disposed of. Mr. McKittrick came back to me and said to me, 'I am awful sorry you have taken that stand; there is no one here would touch the thing at all. Can't we do something to get you to take up this matter, because it is too big a thing to drop?' I said, 'Under no circumstances. I have all the work I want, and you can't make me enter into a contract to work Sundays, holidays and nights; I have had enough of that already.' He said, 'If I can get George Simmons to put in there to work day and nights and Sundays and holidays as far as practicable and this firm will agree to give you a good part of the profits you can make, won't you undertake to do it?' I told him that if they would put in the contract or in the agreement that we will work day and nights and Sundays and holidays as far as practicable, and leave it to me, and would give me a good part of the profits, I would agree to it. That evening he saw Mr. Simmons, and came back and says, 'I have got that arranged. George Simmons says he can't get along without you; he wants you to do it, and you have to help out. This is the biggest thing our house ever had, and if you will undertake it, will see that the firm will give you a good part of the profits.' I said, 'All right.' I went down the next day and I got my samples and went to work. He said if I would undertake it and keep up my other duties at the store the house would give me a good share of the profits, and they would be something handsome. He never said half the profits. The agreement was never reduced to writing, but I told all of the directors but one about it. Simmons agreed to pay Hargadine-McKittrick Dry Goods Company $1.72 per dozen for the large bags and $1.40 per dozen for small bags, and Hargadine-McKittrick Dry Goods Company agreed to deliver six thousand per day. Simmons furnished all money for labor; also the machines that were used, and all necessary material except thread. Hargadine-McKittrick Dry Goods Company furnished the factory space in the above-mentioned factory which it had under lease. The money advanced by Simmons was placed to the credit of Hargadine-McKittrick Dry Goods Company and checked out to pay for work. I organized the factory force and superintended the work. There were sixteen hundred men on the payroll. The factory worked all day and from six to eleven at

night and Sundays and holidays, except Christmas. At Mr. Simmons's demand we produced at first eight thousand per day, then nine thousand, then ninety-five hundred, then ten thousand and finally thirteen thousand five hundred. The work consisted of cutting and sewing the bags and putting on the leather. No part of the work was done by Simmons. Hargadine-McKittrick Dry Goods Company charged Simmons for the bags and credited him with cash advanced for labor. The work commenced about December 1, 1914.''

The witness here identified page 5 of an account book and testified that the profits shown are from January 1, 1915, and thereafter. No account is taken of losses or profits prior to that date.

''Shortly after we started Simmons asked me to undertake the leather work, that is, cutting the leather and preparing it to go on the knapsacks. This we did, and for this leather work we received the wages of the help and $3,000 for overhead and $10,000 for profit. After we took over this part of the work this payroll was kept separate, and Simmons sent the money for this payroll. Simmons furnished between five hundred and six hundred machines. We used a few of those we had in the factory. We had at that time about fifteen set up in the factory and about seventy all told in boxes and set up. Those that we used had to be refitted with new parts to do this kind of work and had to be adjusted for the work. The expense of all this was borne by Simmons. I formed the organization, superintended the getting of help and did everything necessary to see that the business of getting out these bags proceeded.

''We commenced operating on a quantity production basis in December, and from then on ran several months steadily, working day and night, Sundays and holidays, as far as practicable. The production rose from 6,000 per day to 13,500 per day. I think it was about April when the night work ceased and the plant was just running in the daytime. The knapsacks were inspected by the officials of the British Government, and when they decided to discontinue the night work it was discontinued. Until the night work was discontinued I worked nights anywhere from eight to nine o'clock until 11:30 P. M. to two o'clock in the morning. During the period when the night work was on I missed only about one or two nights. During the day I ran up to the factory two or three times to see that everything was running properly, and spent the rest of the daytime at the store of the Hargadine-McKittrick Dry Goods Company.

''In March, 1915, the Hargadine-McKittrick Dry Goods Company sold its stock of goods to the Ely-Walker Dry Goods Company and quit business. The factories of the Hargadine-McKittrick Dry Goods Company, of which I had charge in the store at 911 Washington Avenue, were run for some little time after that to run out the

goods in the factories, and I continued to handle those as well as run the bag contract. The 800,000 bags were completed in September, 1915. After that the factory continued to operate on some material and made, I believe, about 200,000 more for Simmons, but I was not in there at that time. I did not stay after the completion of this contract for 800,000. The profits from the 800,000 bags of the Hargadine-McKittrick Dry Goods Company were a little over $60,000.

"Demand was made and payment refused."

At the conclusion of above testimony, the court sustained defendant's demurrer thereto, and in doing so, expressed his reasons therefor as follows:

"By THE COURT: This action is based on an alleged express contract of joint adventure. A contract of joint adventure is a contract of partnership as to a particular enterprise, and is subject to all the rules ordinarily applying to general partnerships, except that a party to a contract of joint adventure may sue at law to recover his share of the profits. The only proof of any contract is the testimony of plaintiff that early in November, 1914, Thomas H. McKittrick, who was at that time president of Hargadine-McKittrick Dry Goods Company, said to plaintiff, who was an employee of the company in charge of several of its departments at a salary of at least $4,500 per year, that if plaintiff would undertake, in addition to his other duties, to organize a force and superintend the carrying out of a contract which George W. Simmons had offered the company, calling for the manufacturing of bags, the company would give him a large share of the profits; that it would be something handsome. To this plaintiff agreed. Thereupon the Hargadine-McKittrick Dry Goods Company accepted the contract from Simmons and the bags were manufactured by the Hargadine-McKittrick Dry Goods Company at one of the company's idle factories under the direction of the plaintiff. There was no agreement to share losses, and plaintiff does not appear to have assumed any responsibility in the matter, except to render services. This is not a contract of joint adventure or of partnership. It does not contain a single element of a partnership agreement, except an indefinite provision for sharing profits, and it is plain that there was at the time no intention on the part of these parties to form a contract of partnership. It is simply a contract by an employer for additional services from an employee in consideration of a bonus or extra compensation out of the profits. When so considered the contract is absolutely void for uncertainty. It is elementary that a contract to be valid must be sufficiently certain and specific so that the intention of the parties may be determined to a reasonable degree of certainty, whereas in this case, in the important element of a consideration to be paid, the contract provision is so vague and indefinite that no court or jury can say what

the parties intended to be paid. The most that can be said of the expression, 'A good share of the profits; it will be something hand-some,' is that it is a contract to pay the reasonable value of the extra services, which could be enforced in an action of *quantum meruit*. This action, however, is not brought on a *quantum meruit*. Plaintiff sues on an express contract of joint adventure, and having failed to prove same, the demurrer to the evidence will be sustained.

"The case of Varney v. Ditmars, 217 N. Y. 223, and Butler v. Kem-merer, 218 Pa. St. 242, fully sustained these views."

I. It is claimed by appellant that the trial court erred in sustain-ing respondent's demurrer to his evidence.

In passing upon this question, we must proceed on the theory that all the matters well pleaded in the petition, and shown by the evi-dence, are to be taken as true. In addition thereto, in considering the case presented, the plaintiff is en-titled to every reasonable inference which a fair-minded jury of average intelligence might draw from the proven facts.

**Demurrer to Evidence.**

Section 1220, Revised Statutes 1919, requires that a valid petition shall contain "a plain and concise statement of the facts constituting a cause of action, without unnecessary repetition." The petition here-in was not attacked by demurrer or otherwise, nor was any portion of plaintiff's testimony objected to at the trial. Whether this be an action upon an express contract, for *quantum meruit,* or for money had and received, the same general facts, as stated, would have been necessary to present a clear and intelligent idea of the controversy between the parties. If considered as an express contract, it does not purport to disturb the executed agreement made between de-fendant and Simmons for the manufacture and sale by the former, to the latter, of the 800,000 sacks for which defendant received the contract price, and realized therefrom profits to the amount of $60,000.

In sustaining the demurrer, the trial court said: "Plaintiff sues on an express contract of joint adventure, and having failed to prove same, the demurrer to the evidence will be sustained."

The petition charges, and the evidence shows: "That defendant then and there agreed with plaintiff that if he would become a joint adventurer with defendant in the work of manufacturing said ar-ticles and carrying out its said contract with said Simmons, and if the plaintiff would undertake to form a factory force and organiza-tion for the purpose of manufacturing said knapsacks and bags and would superintend and direct said organization and would work night and day, as far as possible, in the manufacture of said knapsacks and bags, in event he could make a profit from the manufacture of said bags and knapsacks, plaintiff should be entitled to and would receive

a good part or share of any profits accruing from the execution and fulfillment of said contract, but plaintiff should receive nothing if no profits were made." The petition then charges, and the evidence shows, that plaintiff fully performed his part of said agreement with defendant. It likewise alleges, and the evidence shows, that George W. Simmons performed his part of the agreement with defendant; and that he paid the latter for the 800,000 bags, out of which defendant made a profit of $60,000. The petition alleges, and the evidence shows, that defendant performed its part of the contract aforesaid, except that it has paid this plaintiff no part of the profits arising from the performance of the executed contracts aforesaid.

The evidence shows that plaintiff was a stockholder in the defendant company; that he was working on a salary of $4,500 or $5,000 per year and had charge of the ready-to-wear shirt-and-neckwear departments of defendant's business. In addition to his regular employment, he had the legal right to, and did, make a valid contract with defendant for a portion of the profits realized from the above venture. [Putnam v. Juvenile Shoe Corporation, 269 S. W. l. c. 596.]

In Webster's New International Dictionary the word "venture" is defined as meaning: "To take the chances." Plaintiff did not contract for additional wages, but for a reasonable proportion of the profits, and if none were made, he was to receive nothing for the extra service rendered defendant. The demurrer admits the making of the above contract between plaintiff and defendant, and admits that defendant received from the foregoing venture profits amounting to $60,000. The jurors had before them all the facts relating to the above venture and, especially, the important services rendered by plaintiff in producing the above profit. They likewise had before them the fact that defendant, without the investment of a dollar for pay roll, material (except thread), machinery or any expenses whatever, collected through the efforts of plaintiff a profit of $60,000, under an agreement to give him a good part of same for the services rendered. It was the province of the jury to take into consideration the relative services rendered by plaintiff and defendant respectively and, in the absence of evidence to the contrary, they had the legal right to infer that the services rendered by plaintiff in producing the $60,000 profit, were at least of equal value to those rendered by defendant. [Knapp v. Hanley, 108 Mo. App. l. c. 361; Wetmore v. Crouch, 150 Mo. 671; Lind v. Webber, 36 Nev. l. c. 631; Hoge v. George, 27 Wyo. l. c. 447; Gius v. Coffinberry, 39 Ore. l. c. 419; Rankin v. Black, 38 Tenn. l. c. 658; Senneff v. Healy, 155 Iowa, 82; 28 Cyc. par. 5, p. 459.]

Taking the trial court's view of the situation, that plaintiff sued on an express contract which had been fully executed, except as to

the failure of defendant to pay plaintiff any part of said profits, we are of the opinion that, under the petition and evidence, the jury, if they had been permitted to pass on the merits, would have been justified in returning a verdict in favor of plaintiff for $30,000 with interest thereon at the rate of six per cent per annum from the commencement of this action.  We accordingly hold that the trial court erred in sustaining a demurrer to the evidence.

II.  It clearly appears from the petition, and evidence, that the contract, on plaintiff's part, had been fully performed and that nothing more remained to be done thereunder, but the payment to plaintiff of the amount due him as his share **Money Had and Received.** of the profits.  Under such circumstances he would have been entitled to recover for money had and received.  The court, therefore, erred in non-suiting him.  [Mansur v. Botts, 80 Mo. 651; Williams v. Railroad, 112 Mo. 463; Moore v. Gaus & Sons Mfg. Co., 113 Mo. 98.]

III.  We have read with much interest the array of authorities and questions discussed in the briefs, but have not deemed it necessary to enter into any extended consideration of same.  If this case had come here on a question as to the amount of recovery, there might be some merit to it, but on the cold-blooded facts as presented at the trial we feel that it would be a travesty upon the law to affirm this judgment.

We accordingly reverse and remand the cause, to be proceeded with in conformity with the views here expressed. *Higbee, C.,* concurs.

PER CURIAM:—The foregoing opinion of RAILEY, C., is adopted as the opinion of the court.  All of the judges concur. *White* and *Blair, JJ.,* concur in a separate opinion of *White, J.,* filed.

WHITE, J. (concurring).—I concur in the result reached in this case by RAILEY, C.  I do not think that a partnership was pleaded or proven.  There appears to have been no demurrer to the petition, and the evidence was introduced as if it stated a cause of action.  But the petition did not allege nor the proof show a contract of partnership, for there was no provision for sharing the losses and no definite provision relating to the division of the profits.

In my opinion the evidence makes out a case entitling the plaintiff to recover in *quantum meruit.*  He showed a contract of employment without any definite agreement as to compensation.  He proved that he accepted the employment, undertook the work under consideration, performed it with fidelity and efficiency, realizing large profits to his employer; it was extra work outside of his ordinary employment.  He was entitled, therefore, to recover the value of the services ren-

dered—strictly a *quantum meruit* case, and the demurrer to the evidence, therefore, was improperly sustained.

On a new trial the plaintiff may, if so advised, frame his petition more accurately and specifically to declare in *quantum meruit.*

I therefore concur in reversing the judgment and remanding the cause. *Blair, J.,* concurs in these views.